2010 Ark. 449

**CITY OF ROCKPORT, Arkansas,
Appellant**

v.

**CITY OF MALVERN, Arkansas,
Appellee.**

**No. 10–151.**

Supreme Court of Arkansas.

Nov. 18, 2010.

Catlett Law Firm, PLC, Little Rock, by: Christian C. Michaels, for appellant.

David Kizzia, Randy Hill, and Anderson, Murphy & Hopkins, L.L.P., Little Rock, by: Brett D. Watson, for appellee City of Malvern.

DONALD L. CORBIN, Justice.

Appellant City of Rockport appeals the order of the Hot Spring County Circuit Court finding substantial compliance with certain annexation requirements set forth in Ark.Code Ann. § 14–40–2002 (Supp. 2009). On appeal, Rockport argues that the circuit court erred in concluding that sewer services were provided, accepted, and in place or that the parties took substantial steps to cause the requested sewer services to be provided, accepted, and in place in accordance with the statutory requirements. Additionally, Rockport argues that the circuit court erred in failing to recuse where there was an appearance of impropriety. We find no error and affirm.

Aaron Wright and Leann Wright–Welch ("landowners") own real property that was located within the incorporated limits of the city of Rockport prior to 2001.[1] They sought to detach from Rockport and be annexed into the city of Malvern on or about May 11, 2001, pursuant to section 14–40–2002, the statutory provision governing detachment and annexation. As part of the statutory process, the landowners requested Malvern to provide city services, such as sewer, fire protection, street-sweeper service, police protection, animal control, and services from the municipal water department. Malvern adopted Resolution No. 09–01 accepting the Wright–Welch property and committing to make the requested services available. Thereafter, Rockport filed suit in circuit court seeking to have the annexation set aside. The circuit court upheld the annexation, and this court affirmed that decision. *See City of Rockport v. City of Malvern*, 356 Ark. 393, 155 S.W.3d 9 (2004) (*Rockport I* ).

On August 28, 2008, Rockport filed a complaint for declaratory judgment, averring that the deadline, pursuant to section 14–40–2002(b)(2)(B)(iii), for Malvern to provide the requested services expired on or about March 11, 2005, twelve months from the date this court affirmed the annexation in *Rockport I*. In its complaint,

---

1. Although named as defendants in Rockport's complaint for declaratory judgment, neither Wright nor Wright–Welch have filed a brief or otherwise taken any action in the instant appeal.

Rockport asserted that Malvern failed to provide, or take substantial steps to provide, the requested services, particularly sewer service, to the Wright–Welch property. Thus, according to Rockport, Malvern's failure to comply with the statutory-time provision required a finding that the annexation was void as of March 11, 2005. Further, Rockport sought a court order requiring Malvern to remit to it the full amount of all sales-tax collections and other revenues collected by Malvern since March 11, 2005, that would have otherwise been collected by Rockport had the annexation never occurred. Malvern filed an answer denying the claims asserted by Rockport and also asserting several affirmative defenses, including res judicata or collateral estoppel, statute of limitations, acquiescence and laches, waiver, and unjust enrichment.

Prior to trial, Rockport also filed a motion requesting the circuit court judge to recuse. In seeking recusal, Rockport asserted that the judge had served as city attorney for Malvern for a number of years and had also represented private clients against Rockport in similar annexation issues. Thus, according to Rockport, there existed an appearance of impropriety. Following a hearing on the motion, the circuit court entered an order denying the motion to recuse.

A bench trial was subsequently held on August 21, 2009. Carl Wheatley, an employee with Malvern Water Works, testified that there was not a sewer main on the Wright–Welch property but that there was one within twenty yards of that property. Wheatley also testified that between March 11, 2004, and March 11, 2005, there had been no work done to connect that main sewer to the property. On cross-examination, Wheatley explained that there was no other work that the city needed to do to have the sewer line in place for the landowners and that the next step to get the property connected to the sewer line was with the landowners.

Steven Northcutt, mayor of Malvern, also testified. He testified that when a landowner annexes into the city, the city provides the requested services. According to Northcutt, there are requirements for landowners who want sewer service once they are annexed into the city. He explained that in this case, the landowners have taken steps to tie onto the sewer line, including going to the planning commission and meeting with a code enforcement officer.

Len Dawson, the code enforcement officer for the city of Malvern, testified that Leann Wright–Welch approached him in 2005 and asked for information about building apartments in Malvern. She brought plans for developing the property at issue here, and the two discussed water and sewer, fire protection, setbacks, streets, roads, cul-de-sacs, and building layout. Dawson also stated that he and Wright–Welch talked about sewer service and that he advised her to use a four-inch gravity-flow drain pipe to service most, if not all, of the apartments. Finally, he stated that the city of Malvern had no additional steps to take to provide sewer service because it was up to the landowners to request a connection.

Wright–Welch testified that she sought to have her property annexed into Malvern because the services she needed were not available in Rockport. She explained that she had architectural plans dating back to 2002 and that she is continuing to develop her plan for that property. She stated that she has discussed connecting to the sewer line with Malvern city employees. According to Wright–Welch, once it is determined what kind of line is needed, where it has to be placed, and all engineering specifics are completed, she will re-

quest and pay for a connection to the sewer line. She stated that she has taken the appropriate steps to make the sewer line accessible between her property and the city's manhole. Wright–Welch testified that she exchanged easements with the owner of an adjoining property, thus, allowing her to access the sewer line or any other needed utility. This easement was executed in February 2004. Wright–Welch also testified that she has spent nearly $50,000 to hire architects, engineers, soil-sample people, and others in developing the property.

Following the bench trial, the circuit court entered an order on September 25, 2009, making the following findings:

6. The Court finds that Malvern has sewer service to the property provided and in place by having a functioning sewer main within 60 feet of the property line. The landowner has not requested nor paid the connection fee for the service. The landowner has significant input on the type of sewer service needed to best develop the property. Malvern may not dictate the type of sewer service the landowner receives nor compel the landowner to pay the expense of connecting a sewer line that is not suited to the requirements of the development.

7. The Court finds that all necessary services required by statute are provided and in place. The Court finds that Malvern has accepted the property and committed to provide the services. The landowner has accepted services from Malvern. Malvern has substantially complied with the statute and is able to connect sewer immediately upon request of the landowner.

Thus, the circuit court denied Rockport's request for a declaration that the annexation was void. This appeal followed.

As its first point on appeal, Rockport argues that the circuit court erred in find-ing that sewer services were "provided, accepted, and in place" where it was undisputed that the sewer system did not reach the landowners' property and the landowners have not requested a connection or paid a connection fee. Similarly, Rockport asserts that the circuit court erred in finding that there has been substantial compliance with the requirements of section 14–40–2002(b)(2)(B)(iii). Malvern argues to the contrary that Rockport's proposed reading of the statute is incorrect and that the evidence established that there had been substantial compliance with the statute.

The standard of review on appeal from a bench trial is not whether there is substantial evidence to support the findings of the circuit court, but whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *See, e.g., El Paso Prod. Co. v. Blanchard,* 371 Ark. 634, 269 S.W.3d 362 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that an error has been committed. *Id.* Facts in dispute and determinations of credibility are solely within the province of the factfinder. *Id.*

Further, we review issues of statutory construction de novo, as it is for this court to determine what a statute means. *Johnson v. Dawson,* 2010 Ark. 308, 365 S.W.3d 913. In this respect, we are not bound by the circuit court's decision; however, in the absence of a showing that the circuit court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. *Id.*

In 1999, Act 779 of 1999, now codified at Ark.Code Ann. §§ 14–40–2001 to –2002 (Supp.2009) (the "Detachment–Annexation Statutes"), was enacted to provide the pro-

cedure for the annexation of land into an adjoining municipality in order to obtain municipal services. Specifically, section 14–40–2002 provides the criteria that allows. a landowner to seek to detach from one municipality and be annexed by another. This section further sets forth requirements dictating when and what actions must occur for the other municipality to annex ⌊7certain land and states the procedure for what happens if the statutory requirements are not satisfied. It provides in relevant part as follows:

> However, if the requested services are not provided, accepted, and in place within twelve (12) months after the property is accepted by the annexing jurisdiction or substantial steps are not taken to provide, accept, and have the services in place within this time period, then the detachment and annexation shall be void and all property returned to its original jurisdiction.

Ark.Code Ann. § 14–40–2002(b)(3)(B)(iii).

■. In the instant case, it is undisputed that Malvern has provided a sewer line that is approximately twenty yards from the Wright–Welch property. City officials from Malvern testified that the city had taken all necessary steps to provide sewer service. The evidence also demonstrated that while sewer service was not operational, there were substantial steps taken to accept and have those services in place. As previously set forth, the landowners obtained a utility easement, which is necessary for them to access and eventually connect to the sewer line. There was testimony from Wright–Welch regarding the expenditure of substantial funds to architects and engineers to assist in the development of the property, including a determination of what type of sewer connection will be required. In addition, city officials testified that the landowners were engaged in continuous efforts to develop the property.

There is simply no merit to Rockport's argument that Malvern has not complied with its requirement to provide sewer service because there is no sewer line on the property. Nothing in the statute requires the sewer line to be physically on the property. The statute requires that it be provided, and the evidence presented was that it was common practice for ⌊8Malvern to provide a sewer line that the landowners could then connect to. Likewise, the statute makes no requirement that the requested service be in use; rather, it must be accepted. Here, there is evidence that the landowners have substantially complied with the requirement that they accept the service, including testimony that the landowners obtained a utility easement to access the sewer line. Moreover, there was evidence that the landowners had met with code enforcement officers and hired architects and engineers to aid in developing the property, including a determination of what type and where to place a connection to the sewer line. As to "in place," Rockport would have that phrase equate to the services being "in use," which conflicts with a plain reading of the provision.

■ Even if we were to conclude that there was some ambiguity within this provision, we still cannot say the circuit court erred in finding substantial compliance. Where a statute is ambiguous, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *City of Maumelle v. Jeffrey Sand Co.*, 353 Ark. 686, 120 S.W.3d 55 (2003). We may also look to the emergency clause to determine legislative intent. *Id.* The purpose section of the Detachment–Annexation Statutes provides as follows:

It is the purpose of this subchapter to assist landowners to obtain municipal services by making the services reasonably available. However, nothing in this subchapter shall relieve a landowner from the obligation to pay regular fees and costs for connecting to services or from the obligation to pay the regular cost of the services.

Ark.Code Ann. § 14–40–2001. As we recognized in *Jeffrey Sand*,

[t]he purpose and objective of the statute is to provide a mechanism by which a landowner may obtain services. The emergency clause of Act 779 of 1999 identified aggrieved landowners as those currently being "inadequately served by the municipality in which [the lands are] located where the needed services exist *in* a bordering municipality." 1999 Ark. Acts 779, § 6 (emergency clause) (emphasis added). This language indicates that the remedy the legislature sought to provide was to give the landowner a means of obtaining services to the property.

*Id.* at 694, 120 S.W.3d at 59.

In the prior appeal where Rockport challenged the initial annexation, this court noted that "it is completely reasonable to conclude that sewer service is necessary to 'maximize the use and value of [one's] property.'" *Rockport I*, 356 Ark. at 401, 155 S.W.3d at 15 (quoting Ark.Code Ann. § 14–40–2002(b)(1)(A) (Supp.2003)). The evidence presented here indicated that Rockport was still not able to provide sewer service to the property at issue. And, while the services Rockport is able to provide is not a determining factor in whether there has been substantial compliance in providing, accepting, and having services in place, it does impact our analysis from the standpoint that a rigid interpretation

of section 14–40–2002(b)(3)(B)(iii), such as the one advanced by Rockport in this case, would defeat the legislative intent of this statutory scheme. In other words, accepting Rockport's stringent analysis and voiding the annexation, in light of all the evidence that the landowners are attempting to develop their property and need Malvern's city's services to do so, would defeat the statutory purpose of section 14–40–2002 and would also lead to an absurd result. It is axiomatic that this court will not interpret a statute in a manner that defeats its legislative purpose, nor will we interpret a statute to lead to an absurd result. *Jeffrey Sand*, 353 Ark. 686, 120 S.W.3d 55.

In sum, considering the evidence presented and being mindful of our standard of review, we cannot say that the circuit court erred in finding that there has been substantial compliance with the requirements of section 14–40–2002(b)(2)(B)(iii) that the sewer service be provided, accepted, and in place within twelve months.

As its final point on appeal, Rockport asserts that the circuit court erred in failing to recuse where the judge had served as city attorney for Malvern and had also represented parties adverse to Rockport in previous litigation. This prior representation, according to Rockport, goes beyond the possible appearance of impropriety. Rockport further asserts that it met its burden of demonstrating bias and the appearance of impropriety. Malvern counters that the circuit court did not abuse its discretion in denying the motion to recuse where Rockport made no allegation of actual bias or prejudice.

In support of its recusal argument, Rockport relies, in part, on the Code of Judicial Conduct.[2] Rule 1.2 states as follows:

---

**2.** Although Rockport's motion to recuse, and    now its argument on appeal, refers to Canons

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

Ark. Code Jud. Conduct R. 1.2 (2010). Rule 2.11 governs the issue of judicial disqualification and lists, among the bases for disqualification, instances where the judge served as a lawyer in the matter in controversy or served in governmental employment, and in such capacity, participated personally as a lawyer concerning the proceeding. Ark. Code Jud. Conduct R. 2.11 (2010). Rockport goes beyond asserting an appearance of impropriety and argues that the impartiality of the circuit judge might reasonably be questioned.

The rule is long established that there is a presumption of impartiality on the part of judges. *Searcy v. Davenport*, 352 Ark. 307, 100 S.W.3d 711 (2003); *City of Dover v. City of Russellville*, 346 Ark. 279, 57 S.W.3d 171 (2001). A judge's decision to recuse is within the circuit court's discretion and will not be reversed absent an abuse of that discretion. *Searcy*, 352 Ark. 307, 100 S.W.3d 711. The party seeking recusal must demonstrate bias. *Bradford v. State*, 328 Ark. 701, 947 S.W.2d 1 (1997). Further, this court has noted that, unless there is an objective showing of bias, there must be a communication of bias in order to require recusal for implied bias, and the mere fact that a judge has ruled against a party is not sufficient to demonstrate bias. *See Searcy*, 352 Ark. 307, 100 S.W.3d 711.

Even if we were to ignore our long-standing rule that bias must be demonstrated, *see, e.g., Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999), we cannot agree with Rockport's assertion that the circuit court erred in denying the motion to recuse. Even though the circuit judge served as city attorney for Malvern before taking the bench, he did not represent Malvern in the instant, or a prior, annexation suit. While the judge did represent private landowners in a similar annexation suit against Rockport before taking the bench, that prior litigation concerned the issue of whether Malvern's initial annexation was valid. The circuit judge did not represent the current landowners nor did he represent other landowners in the instant suit regarding whether Malvern had complied with the statutory requirements imposed after an annexation occurs. Thus, where there was no allegation of actual bias, nor any demonstration by Rockport of prejudice, we cannot say that the circuit court abused its discretion in denying the motion to recuse.

Affirmed.

BROWN, J., concurs.

BROWN, Justice, concurring.

Although I agree with the majority that the circuit judge did not abuse his discretion in denying the motion to recuse, I question the majority's conclusion that our case law and judicial canons require recusal only when there is an objective showing of bias or a communication of bias. In certain instances, particularly where there is an economic entanglement between a party and the judge, an appearance of

2(A) and 3(E)(1), new canons were adopted by this court and became effective, July 1, 2009. *See In re Ark. Bar Ass'n Petition to Amend Code of Jud. Conduct*, 2009 Ark. 238 (per curiam). Because Rockport filed its motion to recuse on July 30, 2009, the amended

version of the Code of Judicial Conduct governs. As such, the provision formerly codified in Canon 2 is now found within Rule 1.2, and the provision formerly codified within Canon 3(E)(1) is now found within Rule 2.11.

impropriety may force a recusal. *See Huffman v. Ark. Jud. Discipline & Disability Comm'n*, 344 Ark. 274, 42 S.W.3d 386 (2001).

In *Huffman*, the judge petitioned this court for a writ of certiorari requesting a review of the admonishment action taken against him by the Judicial Discipline and Disability Commission (JDDC) for violations of Canons 2A and 3E(1) of the Arkansas Code of Judicial ₁₃Conduct.[1] 344 Ark. at 276, 42 S.W.3d at 388. We held that Judge Huffman's conduct in this case, participating in a case involving Wal–Mart when he held a significant amount of Wal–Mart stock, violated Canons 2A and 3E(1). We said that the first issue to consider in a situation such as this where the judge has an economic interest in a party to the proceeding is whether there is an appearance of impropriety and impartiality under Canon 2A. Reiterating that a judge must avoid all impropriety and any appearance of impropriety and, citing the commentary to Canon 2A, we set out the test for appearance of impropriety as being "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Id.* at 283, 42 S.W.3d at 392. In the case where a judge has an economic interest in a party litigant, we said that the judge should consider this test for the appearance of impropriety and determine whether his economic interest would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality

and competence is impaired. If the answer to this question is yes, we said the judge should recuse.

₁₄Last year, the United States Supreme Court held that under some extreme circumstances, the Due Process Clause of the United States Constitution requires judicial recusal. *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). In *Caperton*, Massey's president contributed "almost $2.5 million to 'And For The Sake Of The Kids,' a political organization formed under 26 U.S.C. § 527" that supported of one of the candidates running for the state supreme court. *Id.* at 873, 129 S.Ct. 2252. In addition, Massey's president spent "just over $500,000 on independent expenditures" in support of this candidate. *Id.* That candidate was elected as a state supreme court justice and took part in the decision reversing a $50 million jury verdict rendered against Massey. The Court first recognized that most matters relating to judicial disqualification do not rise to a constitutional level. However, there are additional instances, such as those involving circumstances "in which experience teaches that the probability of actual bias on the part of the judge is too high to be considered constitutionally tolerable," which, objectively, require recusal. *Id.* at 877, 129 S.Ct. 2252 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). Rather than have a judge conduct his own review into actual bias in these cases, the Due Process Clause has been implemented by objective standards that do not require proof of

1. At the time, Canon 2A read as follows: "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities. A judge shall respect and comply with the law and shall act at all times in a manner that promotes confidence in the integrity and impartiality of the judiciary." Further, Canon 3E(1) read: "A judge shall perform the

duties of judicial office impartially and diligently.... A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." As stated in the majority opinion, the Arkansas Code of Judicial Conduct has since been updated and similar language now appears in Rules 1.2 and 2.11 of the Judicial Code.

actual bias. *Id.* at 883, 129 S.Ct. 2252. The question to be asked is "whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.* at 883–84, 129 S.Ct. 2252 (quoting *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456). The Court concluded that although a judge may conduct his own search for ₍15₎actual bias, objective standards may also require recusal whether or not actual bias exists or can be proved. *Id.* at 886, 129 S.Ct. 2252.

Though I agree with the majority in this case, I write only to underscore that in certain circumstances, particularly where a judge is economically benefitted, an appearance of impropriety, rather than proof of actual bias, may require recusal. *See Huffman,* 344 Ark. 274, 42 S.W.3d 386. Moreover, there are circumstances where a judge's presence within a case creates such a risk of bias or prejudgment that the Due Process Clause requires recusal. *See Caperton,* 556 U.S. 868, 129 S.Ct. 2252.