2011 Ark. 51

**HARRILL & SUTTER, PLLC, Appellant**

v.

**Cynthia KOSIN, Appellee.**

No. 10–518.

Supreme Court of Arkansas.

Feb. 9, 2011.

Lane, Muse, Arman & Pullen, Hot Spring National Park, by: Sherri Arman McDonough, for appellant.

Wood, Smith, Schnipper, Clay & Vines, Hot Spring National Park, by: Philip M. Clay, for appellee.

COURTNEY HUDSON HENRY, Justice.

Appellant Harrill & Sutter, PLLC ("Harrill") appeals a Garland County Circuit Court order ruling that appellee Cynthia Kosin discharged Harrill for cause, thereby determining the attorney's fee, pursuant to Arkansas's attorney-lien statute, Arkansas Code Annotated section 16–22–304 (Supp.2009), based upon quantum-meruit recovery rather than the parties' fee agreement. For reversal, Harrill argues that the circuit court erroneously applied the attorney-lien statute. Kosin brings a cross-appeal seeking attorney's fees pursuant to Arkansas Code Annotated section 16–22–308 (Repl.1999). Our jurisdiction is proper pursuant to Arkansas Supreme Court Rule 1–2(a)(5) (2010). We affirm the direct appeal and reverse and remand on Kosin's cross-appeal.

## I. *Facts*

Kosin's husband, John Robert Kosin, died on March 3, 2003. At the time of his death, Kosin resided in Arkansas but held business headquarters in Virginia, engaged in businesses in several states, made payments to a previous wife on her divorce settlement, and had numerous tax difficulties. The record reveals that his businesses did not pay employee-withholding ("941") taxes.

Stephen Butler of Winchester, Virginia, prepared the decedent's will, dated September 20, 2002. The will nominated But-

ler as executor and trustee and directed Butler to pay a consulting fee to W.R. Reynolds and Rick Lynch, who operated Kosin's companies. The decedent's will left all of his household property and personal effects to Kosin, bequeathed annual payments of $525,000 to his wife for life, and gave her the right for the duration of her life to reside in his Hot Springs residence known as Greystone Estate. Additionally, the will bequeathed lavish gifts to friends and relatives, leaving the remainder of the estate to St. Luke's Episcopal Church. Butler administered the bulk of the estate assets in Virginia, and the court later appointed Melanie Grayson as administratrix of the Arkansas estate, which included the home and personal property. Butler voluntarily paid Kosin a widow's allowance of $3,000 per month and paid expenses of the home.

On May 23, 2003, Kosin consulted with Raymond Harrill and engaged the Harrill law firm to represent her in all matters pertaining to her rights to inherit from her husband's estate. Kosin expressed her concerns about Butler, certain executives in her husband's companies, and their potential conflicts of interest. Raymond Harrill requested the assistance of his partner, Luther Sutter, because of the complexity of the case. On June 18, 2003, Harrill and Kosin entered into a contingency-fee agreement whereby the law firm was to receive "twenty percent (20%) of the gross amount received from John Kosin's estate presently or in the future, or if the matter is settled, or thirty percent (30%) of the gross amount received from John Kosin's estate presently or in the future, with a lawsuit seeking to set aside the pre-nuptial agreement as filed, or an election to take against the will as filed."

In order to determine Kosin's rights to elect against the will, Harrill needed to obtain a complete financial picture of the decedent's companies. From June 10, 2003, through July 30, 2004, Sutter requested information from Butler in twenty-two letters. As a part of his administrative duties, Butler supplied Sutter with an accounting of the ongoing expenses of the estate, a copy of a premarital agreement between Kosin and the decedent, a copy of a divorce and separation agreement between the decedent and his previous wife, and 2002 tax returns for various corporations in which the decedent had an interest. Butler advised Sutter that Butler's course of action was to sell the decedent's principal business assets and to close those that were not profitable. Butler further notified Sutter that the president of the corporation offered to purchase the profitable assets of the decedent's estate. On July 21, 2003, Butler provided Sutter with a copy of the inventory of the Virginia assets, and in August 2003, Sutter opened an ancillary estate in Garland County Circuit Court to administer the Arkansas property.

On November 11, 2003, Butler notified Sutter by letter that Butler had entered into a contract to sell the decedent's businesses for $39.4 million with a contingency clause that allowed Butler to be released from the contract if he deemed the sale inadequate. The letter informed Sutter that he engaged Management Planning, Inc., to appraise the restaurants in order to determine the validity of the purchase price, but he would rely in part upon an evaluation performed by the pending lender of the estate. More significantly, Butler enclosed a copy of the appraisal of Greystone, which indicated a value of $2.9 million. Butler noted that he would favor a settlement of the real estate whereby Kosin would be entitled to the sale proceeds free of trust less the expenses of the sale, settlement with the church, and payoff of the existing deed-of-trust indebtedness, taxes, and expenses of the Arkansas

administration. Butler later testified that he offered Kosin the net value of the home, which he estimated to be in excess of $1 million. Sutter forwarded a copy of the letter to Kosin, but according to Kosin, Sutter did not explain the terms of the offer. Further, nothing in the record reveals that Sutter attempted to explain to Kosin that this offer exceeded her dower-and-homestead interest and, if settled upon this basis, would have resulted in a settlement amount greater than that which Kosin would have ultimately received. Sutter did not discuss the offer with Kosin until September 1, 2004, after learning that Kosin had retained Friday, Eldredge & Clark ("the Friday firm"). At that time, Sutter advised Kosin of the $1 million settlement offer and advised that he acquired this information, not from Butler, but from Melanie Grayson, the administratrix of the ancillary estate.

Additionally, on September 1, 2004, Sutter wrote Butler a letter stating that Kosin was concerned about the 941 tax issue and continued to grow impatient about its resolution. Sutter reminded Butler that he had requested ninety days to prepare a plan concerning the issue and added:

> If there is no timetable forthcoming in the near future, my client may very well be forced to advise the IRS of these 941 tax issues in order to bring this matter to a conclusion.... [I]n my view of the pending litigation concerning the premarital agreement and will, my client is hesitant to elect against the will until the IRS tax liability is liquidated. Accordingly, I must insist that the IRS be notified of this 941 tax issue on or before December 1, 2004, by letter, copied to me.

On January 16, 2004, Butler informed Sutter that the decedent's profitable businesses had been sold on December 31, 2003, for the total purchase price of $44,650,000. Although Sutter had two notices of the pendency of the sale, neither Sutter nor any other member of the Harrill firm took any action to avoid the sale, nor did they retain counsel in Virginia to assist in the Virginia proceeding until February 2004 after the sale occurred. Further, Sutter later told Butler that he intended to notify the Internal Revenue Service regarding unpaid 941 taxes. According to Allison Cornwell of the Friday firm, Sutter's communication to the IRS regarding the unpaid 941 taxes before the estate prepared all the tax returns would have resulted in adverse consequences to the estate, and the estate would have lost its ability to negotiate. Butler subsequently suspended the $3,000 voluntary payments to Kosin because he felt that his dealings with Harrill were becoming adversarial.

In late summer 2004, Kosin became dissatisfied with Harrill's representation. When she expressed her concerns, Sutter advised her to obtain a second opinion, and Kosin sought advice from Cornwell and Byron Eiseman at the Friday firm. On September 6, 2004, Kosin sent a letter to Comwell and Eiseman and expressed multiple reasons for firing Sutter. In her letter, Kosin asserted the following reasons for the discharge: (1) Sutter did not keep her informed about the billing on a monthly basis; (2) Sutter insisted upon chartering a private aircraft to Virginia, and Kosin believed it was too expensive; (3) Kosin learned from her husband's daughter, rather than Sutter, about the $44 million sale of her late husband's business, and when she called Sutter, he was unaware of the sale; (4) Kosin was extremely dissatisfied with Sutter's communication with Butler and believed that Sutter attempted to proceed to trial to achieve the thirty-percent fee; (5) Kosin personally obtained three affidavits, rath-

er than Sutter, pertaining to issues in the case; (6) Kosin and Sutter had a conflict about Kosin's desire to fire Paul Guthrie, her groundskeeper, whom Kosin believed was working closely with Butler; (7) Kosin believed that Sutter did not attempt to regain any help from the estate when Butler cut off her monthly payments; (8) Sutter had instructed Melanie Grayson, who provided reimbursements to Kosin, not to communicate with Kosin; (9) Kosin stated that she did not trust Sutter, particularly because she repeatedly requested documentation, which she never received; (10) Kosin doubted Sutter's expertise in handling decedent's estate matters in light of the fact that he recognized himself as a criminal defense attorney; (11) Michael Hatch, Kosin's CPA, advised Kosin to fire Sutter because Hatch believed Sutter did not protect Kosin's best interests; (12) difficulties in communication with Sutter once Kosin chose to get a second opinion from the Friday firm; (13) Sutter's behavior toward her; (14) Sutter filed a document regarding the validity of the prenuptial agreement that, Kosin claimed, contained false information; (15) Kosin believed that Sutter and a businessman, Dan English, wanted to buy her properly.

On September 21, 2004, Kosin discharged Harrill. Cornwell and Eiseman met with Sutter and Harrill to discuss the transfer of Kosin's file. On October 1, 2004, Harrill notified Butler, the Friday firm, and Kosin that Harrill planned to assert an attorney's lien on all sums recovered by Kosin from the decedent's estate, accrued costs, and attorney's fees. On February 10, 2006, Harrill filed suit to enforce an attorney's lien, pursuant to Arkansas Code Annotated section 16–22–304, to protect its claim for attorney's fees for services rendered on behalf of Kosin. In its complaint, Harrill alleged that Kosin breached her contract with Harrill and

requested $75,000. Harrill requested the imposition of an attorney's lien upon Kosin's share of the proceeds from the decedent's estate. In its prayer for relief, Harrill sought declaratory judgment finding entitlement to a lien against the home in Hot Springs, compensatory and consequential damages, attorney's fees, and costs. Kosin answered and denied that Harrill was entitled to any relief sought. Kosin's answer also sought dissolution of the lis pendens filed by Harrill and pled that she was justified in terminating the attorney-client relationship.

After Kosin hired the Friday firm, Cornwell became aware that the decedent's estate was insolvent in both Virginia and Arkansas. Cornwell testified that, as Kosin's attorney, she had two primary concerns: (1) getting Kosin's prenuptial agreement set aside so that Kosin would not take under the will of an insolvent estate, and (2) selling Greystone and convincing the IRS that her dower interest came before the IRS's interest for nonpayment of taxes. Once the Friday firm's representation began, Butler resumed paying the $3,000 widow's allowance. Ultimately, the Friday firm accomplished its two objectives. The Friday firm worked closely with Butler, and Kosin's prenuptial agreement was invalidated. Greystone sold for $1.6 million, and Kosin realized approximately $550,000 from Greystone's sale with $225,000 of that amount deposited into an escrow account pending the outcome of the litigation.

On December 11, 2008, Butler wrote a letter to Cornwell at the Friday firm stating that he believed Sutter's representation of Kosin was detrimental to her interests. Butler believed that, despite providing Sutter with access to all estate records, answering all of Sutter's questions and providing access to the estate's accountants, Sutter engaged in a course

of conduct that would have prevented any settlement of the case except by trial. Butler further stated that, as a direct result of Sutter's actions and threats, the voluntary distributions from the estate to Kosin stopped. Butler also opined that Sutter exhibited a basic lack of understanding regarding claims by creditors and the tax authorities against the estate and that Sutter's threat to inform the IRS of 941 tax liabilities would have resulted in adverse consequences to the estate. Lastly, Butler asserted that, if Sutter had continued as counsel for Kosin, then Butler would have neither made any distributions to her nor settled any matter except by trial or court order.

The circuit court conducted a bench trial on October 21, 2009, and heard testimony from Raymond Harrill; Luther Sutter; Chris Gomlicker, a former attorney in the Harrill firm; Kosin; Butler; Michael Hatch, Kosin's accountant; Grayson; and Cornwell. On January 4, 2010, the circuit court entered its order, ruling that Kosin discharged Harrill for cause. Specifically, the court found, *inter alia,* that Sutter forwarded the November 13, 2003 letter containing the settlement offer but that Sutter did not discuss or explain the significance of the offer until Kosin had retained the Friday firm; that neither Sutter nor any member of the Harrill firm took any action to avoid the sale, nor did they retain counsel licensed in Virginia; that Sutter engaged in a course of conduct in his representation of Kosin that would have prevented any settlement of the case except for trial when the likelihood of success in such a trial remained in doubt; and that Sutter repeatedly justified his failure to initiate aggressive action regarding the Virginia assets upon a fear that his client might have some exposure to unpaid 941 taxes when "no significant evidence" showed that Kosin had such exposure to the unpaid 941 taxes. In its order, the court further ruled that services rendered by the Harrill firm to Kosin constituted good services to Kosin pursuant to a quantum-meruit recovery in the amount of $55,775.44. The court further ruled that the parties agreed to deposit with Simmons National Bank the sum of $225,000 into a money market account in the name of the Harrill firm and Kosin. The court directed the parties to transfer to the Harrill firm $55,775.44 with twenty-five percent (25%) of all accumulated interest and ordered that the balance, which contained $169,224.56 with seventy-five percent (75%) of the accrued interest to be paid to Kosin and her attorney for appropriate distribution.

Harrill filed a motion to alter, amend, or set aside the judgment, and the court denied the motion. Harrill timely filed a notice of appeal. Kosin filed a motion for attorney's fees asking that she be awarded $54,429.31 and argued that, as the prevailing party, she was entitled to an award of fees. The circuit court denied Kosin's motion, and she filed a notice of cross-appeal.

## II. *Argument*

### A. *Discharged for cause*

On appeal, Harrill argues that the circuit court erred in finding that Kosin discharged Harrill for cause and that Kosin failed to prove this issue by a preponderance of the evidence. Further, Harrill contends that the circuit court erred in its findings of fact and its misapplication of the attorney-lien statute. Harrill asserts that the circuit court erroneously awarded an attorney's fee under quantum meruit rather than the attorney-lien statute, pursuant to Arkansas Code Annotated section 16–22–304.

Harrill urges that this appeal involves a statutory interpretation of the

attorney-lien statute and, as a result, a de novo standard of review applies. Harrill's argument is misplaced. Rather, the pivotal issues are whether Kosin discharged Harrill with or without cause and, based upon that answer, which fee is appropriate. Thus, the appropriate standard of review on appeal from a bench trial is not whether there is substantial evidence to support the findings of the circuit court, but whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *City of Rockport v. City of Malvern,* 2010 Ark. 449, 374 S.W.3d 660. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that an error has been committed. *Id.* Facts in dispute and determinations of credibility are solely within the province of the factfinder. *Id.*

[4–6] We now address whether Kosin discharged Harrill with or without cause. Attorney-client contracts contain an implied provision that the client may discharge the attorney at any time, either with or without cause. *Crockett & Brown v. Courson,* 312 Ark. 363, 849 S.W.2d 938 (1993). Attorneys who are discharged *with cause* retain a lien, but the amount of compensation is determined on a quantum-meruit basis, and the standard for that award is based on the amount of time and expense devoted to the case by the attorney. *Id.* (emphasis added). When an attorney is dismissed *without cause,* the attorney is to be compensated based upon the fee agreement. *McDermott v. McDermott,* 336 Ark. 557, 986 S.W.2d 843 (1999) (emphasis added).

■ There is no bright-line rule for this court to employ when determining whether an attorney was fired for cause. *Mobley Law Firm, P.A. v. Lisle Law Firm, P.A.,* 353 Ark. 828, 120 S.W.3d 537 (2003).

In *Williams v. Ashley,* 319 Ark. 197, 890 S.W.2d 260 (1995), we determined that an attorney was fired for cause when the attorney scheduled and attended an unnecessary hearing. After the hearing, the client was never again able to communicate with her lawyer. Furthermore, in the beginning of their relationship, the client was unable to speak with her attorney and was referred to the secretary with her legal questions. We held that it was implicit in the trial court's findings of fact that appellant was discharged by appellee for cause. *Id.* In *Crockett & Brown, supra,* we affirmed the trial court's finding that an attorney was fired for cause when payment of the attorneys during the litigation became an acrimonious issue. We held that even if an attorney is fired for cause, he or she is entitled to a reasonable value of his or her services notwithstanding that the parties originally entered into a contingent-fee contract. *Id.*

In the present case, Kosin engaged the services of Harrill to pursue a claim against her husband's estate. In June 2003, Kosin entered into a contingency-fee agreement, whereby she agreed to pay Harrill twenty percent if the matter settled or thirty percent if the case went to trial. Over the next two years, Harrill performed work on Kosin's case, but Kosin was dissatisfied with its representation. In her letter to the Friday firm, Kosin cited numerous reasons for her dissatisfaction with Harrill's representation. In addition to the reasons for discharge enumerated in her letter to the Friday firm, Kosin testified at trial that she asserted four reasons in her June 29, 2009 deposition for firing the Harrill law firm: (1) Sutter knew about the sale of the business but did not disclose it; (2) she was unhappy with Sutter's advice to refrain from dating; (3) she believed that Sutter was involved in a scheme with Dan English, to

profit from the sale of her home; and (4) Sutter did not allow her to fire her groundskeeper as soon as she wished. More significantly, Sutter did not advise Kosin of the November 11, 2003 offer of settlement of $1 million until September 1, 2004. Kosin testified that, upon hiring Comwell at the Friday firm, Kosin was stunned that Butler had made a settlement offer. Kosin further stated that Comwell explained the implications of the settlement and that it would have been in Kosin's best interest to accept it.

Butler testified that he met with Kosin before the involvement of the Harrill firm to discuss the details of the estate. He stated that he began paying Kosin $3,000 per month because she was "a widow who needed money to live on." From Sutter's letters, Butler gleaned that the relationship was becoming adversarial, and Sutter told Butler that he intended to notify the IRS of unpaid 941 taxes. Butler believed this action would have caused problems for the estate because the IRS would file liens in Virginia and Arkansas, thereby affecting the sale of Greystone, and would trigger penalties and interest on unpaid taxes. Butler testified that at the time of the decedent's death, neither the state or federal government had filed liens on any unpaid 941 taxes or personal 1040 taxes. Butler opined that Sutter's notification to the IRS of unpaid 941 taxes would not have been in Kosin's best interest. Butler also testified that he was contacted after March 2004 by a Virginia firm that inquired about the estate, its assets, and liens. In Butler's opinion, Sutter should have made his inquiry about the estate's assets and liens at a much earlier date.

Michael Hatch, Kosin's accountant, testified that he met Sutter, who gave him little information regarding the 941 tax issues. Hatch stated that Sutter did not agree to share or discuss any of the tax implications of the case and seemed distracted during their meeting. Hatch testified that Kosin sought to understand the case and its 941 tax implications, and Eiseman explained the 941 tax implications to both Kosin and Hatch.

Further, Comwell testified that, in an effort to help Kosin assert her homestead and dower interest in Arkansas, the Friday firm invalidated the prenuptial agreement and convinced the IRS that Kosin's homestead and dower interest in the estate superseded tax liens. Cornwell testified that she met with Kosin and knew about the "breakdown of trust and communication" between Kosin and Harrill; that it was a "nightmare tax case"; and that she believed Harrill should have disclosed any type of settlement offer to its client.

Although Harrill offered testimony and lauded its efforts on Kosin's behalf, we cannot say that the circuit court's decision was clearly erroneous. Based upon the evidence presented to the circuit court, we hold that the circuit court did not err in ruling that Kosin discharged Harrill for cause in its attorney-lien action.

## B. *Quantum-meruit recovery*

We now turn to Harrill's argument that the circuit court misapplied the law and erroneously awarded a quantum-meruit fee rather than a contractual fee pursuant to section 16–22–304. The attorney-lien law allows an attorney to obtain a lien for services based upon his or her agreement with the client and to provide for compensation. The attorney-lien statutes allow an attorney "to obtain a lien for services based on his or her agreement" with the client and "to provide for compensation in case of settlement or compromise without the consent of the attorney." Ark. Code Ann. § 16–22–301 (Repl.1999). Under the lien statute, Arkansas Code Anno-

tated section 16–22–304, the lien established in favor of the attorney attaches to the proceeds of any settlement, verdict, decision, judgment, or final order in his or her client's favor. However, attorneys who are discharged with cause retain a lien, but the amount is determined on a quantum-meruit basis. *McDermott, supra.*

■ We have consistently held that a discharged attorney may be entitled to compensation for the reasonable value of his or her services notwithstanding that the parties originally entered into a contingent-fee contract. *Salmon v. Atkinson,* 355 Ark. 325, 137 S.W.3d 383 (2003). The plain rationale behind this rule is that where the attorney has conferred a benefit upon the client, such as legal services and advice, the client is responsible to pay such reasonable fees. *Id.* We have held that, among the pertinent considerations in determining the reasonableness of an attorney's fee, not specifically fixed by contract, are: (1) the attorney's judgment, learning, ability, skill, experience, professional standing, and advice; (2) the relationship between the parties; (3) the amount or importance of the subject matter of the case; (4) the nature, extent, and difficulty of services in research; (5) the preparation of pleadings; (6) the proceeding actually taken and the nature and extent of the litigation; (7) the time and labor devoted to the client's case, the difficulties presented in the course of the litigation, and the results obtained. *Crockett & Brown, supra.* In making these determinations, both the trial court's and this court's expe-

rience and knowledge of the character of such services may be used as a guide. *Id.* Considerable weight is to be given the opinion of the judge before whom the proceedings are conducted. *Id.*

Here, Harrill submitted an invoice, reflecting a period from May 23, 2003, through May 19, 2008, charging for time and services in the amount of $89,156.50 and for costs in the amount of $18,880.44 for a total of $108,036.94. Kosin submitted a proposed finding of fact that Harrill provided valuable services for Kosin's benefit until November 19, 2003, approximately the time of the offer of settlement on November 11, 2003. For Harrill's reimbursement, Kosin submitted the amount of $55,775.44, which included $36,975 in fees and $18,880.44 in costs. The circuit court, after making a finding that Kosin discharged Harrill for cause, awarded $55,775.44 pursuant to quantum-meruit recovery. The circuit court examined Kosin's proposed findings of fact that offered an explanation for the amount of the quantum-meruit award. Kosin proposed this amount based upon Harrill's itemized professional-services invoice through November 19, 2003, and suggested $36,975 for Harrill's fees and $18,880.44 for Harrill's costs. This amount appears reasonable for Harrill's time and services, given Sutter's experience in this type of case. Therefore, the circuit court attached more weight to Kosin's calculations than Harrill's. Based upon our standard of review, we cannot say that the circuit court erred in awarding this amount of quantum-meruit recovery.[1]

---

1. The concurrence/dissent cites *Mobley, supra,* for the proposition that a circuit court's specific findings of reasonableness in determining a quantum-meruit award are mandatory. However, in *Mobley,* this court simply reviewed a circuit court's express findings of reasonableness, determined that the court sufficiently considered the factors, and affirmed

the quantum-meruit award. We never stated that a circuit court is required to make specific findings on the reasonableness factors. Here, as in *Mobley,* we can easily discern the circuit court's reasoning in its award of $55,775.44 based upon the foregoing mathematical figures.

### III. *Cross-appeal*

■ For the cross-appeal, Kosin argues that she was the prevailing party and, as such, should have been awarded a reasonable attorney's fee pursuant to Arkansas Code Annotated section ⌐₁₇16–22–308. The standard of review in attorney's-fees cases is well settled. Because of the trial judge's intimate acquaintance with the trial proceedings and the quality of service rendered by the prevailing party's counsel, we usually recognize the superior perspective of the trial judge in determining whether to award attorney's fees. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001). The decision to award attorney's fees and the amount to award are discretionary determinations that will be reversed only if the appellant can demonstrate that the trial court abused its discretion. *Id.*

Arkansas Code Annotated section 16–22–308 gives the circuit court authority to award attorneys' fees in contract actions and provides in pertinent part:

> In any civil action to recover on … breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

■ In awarding fees, circuit courts apply the following *Chrisco* factors: (1) the experience and ability of counsel; (2) the time and labor required to perform the legal service properly; (3) the amount involved in the case and the results obtained; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged in the locality for similar services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client in the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990) (considering argument from counsel and holding that "we [were] persuaded [that] the trial court considered the pertinent facts in arriving at its ⌐₁₈award of $25,000." *Id.* at 230, 800 S.W.2d at 719).

Our case law suggests that the circuit court must give an explanation for its decision in denying attorney's fees. *Little Rock Wastewater Utility v. Larry Moyer Trucking, Inc.*, 321 Ark. 303, 902 S.W.2d 760 (1995) (remanding to the trial court for a determination of whether to award attorney's fees and to give an explanation for doing so); *Whetstone v. Chadduck*, 316 Ark. 330, 871 S.W.2d 583 (1994) (remanding for reconsideration when the trial court's order gives no explanation that can be founded in the proper application of the law).

■ Here, the circuit court found that Harrill was discharged for cause and awarded him quantum-meruit recovery. On December 23, 2009, Kosin moved for attorney's fees in the amount of $54,429.31 and submitted in support of the motion two affidavits and an invoice. In its order denying Kosin's motion, the circuit court made no findings whatsoever, including a specific finding regarding the prevailing

Moreover, the concurrence/dissent suggests that this holding is inconsistent with our remand of the cross-appeal concerning the circuit court's denial of attorney's fees. In the case at bar, the circuit court flatly denied attorney's fees without ruling upon the prevailing party and without providing any pertinent analysis of the *Chrisco* factors. Therefore, we are left with nothing to review on appeal regarding attorney's fees. We further note for remand purposes that the *Chrisco* factors contain four different factors than the reasonableness factors articulated in *Crockett, supra.*

party or any pertinent analysis of the *Chrisco* factors. Accordingly, we are unable to discern exactly on what basis the circuit court denied attorneys' fees. *See Little Rock Wastewater Utility, supra; Whetstone, supra.* We therefore reverse on this point and remand to the circuit court for the purpose of making findings that will enable us to review the fee decision.

Affirmed on direct appeal; reversed and remanded on cross-appeal.

CORBIN, BROWN, and DANIELSON, JJ., concur in part and dissent in part.

ROBERT L. BROWN, concurring in part and dissenting in part.

As recognized by the majority, the following factors should be considered for a quantum meruit fee award when the reasonableness of an attorney's fee is not specifically fixed by contract: (1) the attorney's judgment, learning, ability, skill, experience, professional standing, and advice; (2) the relationship between the parties; (3) the amount or importance of the subject matter of the case; (4) the nature, extent, and difficulty of services in research; (5) the preparation of pleadings; (6) the proceedings actually taken and the nature and extent of the litigation; and (7) the time and labor devoted to the client's cause, the difficulties presented in the course of the litigation, and the results obtained. *See Crockett & Brown, P.A. v. Courson,* 312 Ark. 363, 368, 849 S.W.2d 938, 941 (1993).

The majority, however, though it cites these factors as apposite, does not address them and simply says that "[t]his amount [$55,775.44] appears reasonable for Harrill's time and services, given Sutter's experience in this type of case." More importantly, the trial court did not address these factors but simply concluded in its order that the services rendered "consti-

tute[d] good service pursuant to a quantum meruit recovery." The need for an analysis by the trial court is obvious. Without the factual underpinnings of the trial court's award, this court has nothing to review other than a conclusion.

This court has made it clear that such a conclusory determination does not suffice. In *Mobley Law Firm, P.A. v. Lisle Law Firm, P.A.,* 353 Ark. 828, 120 S.W.3d 537 (2003), after affirming the trial court's finding that the attorney was fired for cause, we addressed the issue of whether the trial court properly considered the factors set out in *Crockett & Brown* when it determined the reasonable value of the discharged attorney's services. We said that "even if an attorney is fired for cause, he is entitled to the reasonable value of his services to the date of discharge." *Mobley Law Firm,* 353 Ark. at 833, 120 S.W.3d at 541. We then said:

The reasonable value of an attorney's services is measured by an attorney's skill and experience, relationship between the parties, the difficulty of the services, the extent of the litigation, and the time and labor devoted to the cause and the results obtained. *Robinson v. Champion,* 251 Ark. 817, 475 S.W.2d 677 (1972).

Here, the trial court made its determination of the fees to be awarded to Mr. Mobley based on the time he spent on the case, the labor involved, his skill and ability, and the nature and extent of the litigation. The trial court found that one-fourth of the amount of the settlement was due to Mr. Mobley, in part, because the case took sixteen months to be resolved, and Mr. Mobley worked on the case for four months, or one-fourth the amount of time. The trial court also found that Mr. Mobley was an experienced attorney who had handled person-

al injury cases since 1958. The trial court determined that Mr. Mobley had performed services for four months until he was terminated and that Mr. Yoakley had also performed adequately as Mr. Barnett's attorney for twelve months, and that each should be compensated accordingly. From the bench, the trial court stated: "The only fair way I can see to come up with a reasonable fee is to divide the time that Mr. Mobley spent on the case. He spent one-fourth of the time and Mr. Yoakley had it three-fourths of the time that it took to conclude." Because the trial court considered Mr. Mobley's effort, experience, skill and time spent, he sufficiently considered the factors in *Crockett & Brown, P.A., supra,* that led to a reasonable distribution of fees to Mr. Mobley and Mr. Yoakley.

*Id.* at 833–34, 120 S.W.3d at 541.

As already referenced, in the instant case, the trial court provided no analysis and failed to make any factual findings to support its conclusion that the services rendered by Harrill & Sutter constituted good services pursuant to a quantum meruit recovery, in the total amount of $55,775.44. Both parties submitted proposed findings of fact, and the circuit court, in a letter dated December 4, 2009, adopted the findings of fact and conclusions of law submitted by Kosin without comment. This lapse in any decision-making analysis by the trial court clearly is at odds with our caselaw.

The majority asserts in a footnote that this court has never stated that specific findings on the reasonableness factors are mandatory. Why then do we require trial courts to consider these factors at all? And how can we possibly give "considerable weight to the opinion of the judge before whom the proceedings are conducted" if we have no idea how the judge arrived at his opinion? *See Crockett & Brown, supra.* In the instant case, although the majority states that we can easily discern the circuit court's reasoning in its award based upon the mathematical figures submitted to the court, I simply do not agree. I agree that the math is discernable but what is not clear is how the court determined that $55,775.44 fee was a reasonable fee for services.

Moreover, the majority is inconsistent when it fails to follow precedent and require an analysis under the factors in *Crockett & Brown* and *Mobley Law Firm* with respect to Harrill & Sutter's attorney's fees and then turns around and requires an analysis of factors under *Chrisco* for a determination of reasonable fees owed to Kosin's counsel under Arkansas Code Annotated section 16–22–308. In a footnote, the majority attempts to distinguish these two situations by saying that in its ruling on Kosin's attorney's fees, "the circuit court flatly denied attorney's fees without ruling upon the prevailing party *and without providing any pertinent analysis of the Chrisco factors.*" This sentence is precisely my point. There was also no pertinent analysis of the *Crockett & Brown* factors. The trial court merely adopted the mathematical figure proposed by Kosin to be the reasonable value of services performed by Harrill & Sutter until November 19, 2003, without any comment or explanation. It is simply inconsistent to require an analysis in one situation and not in the other.

For these reasons, while I agree that cause was shown for the discharge of Harrill & Sutter and remand is necessary to decide reasonable fees owed to Kosin's counsel, I would also remand for an appropriate analysis of quantum meruit fees owed to Harrill & Sutter.

Accordingly, I concur in part and dissent in part.

CORBIN and DANIELSON, JJ., join this opinion.