Cite as 2022 Ark. 206

# SUPREME COURT OF ARKANSAS
**No.** CV–21–557

| | |
|---|---|
| KEITH GIBSON, MARIE HOLDER, ALEC FARMER, PHILIP TALDO, AND ROBERT S. MOORE, JR., AS MEMBERS OF THE ARKANSAS STATE HIGHWAY COMMISSION; LORIE TUDOR, DIRECTOR OF THE ARKANSAS DEPARTMENT OF TRANSPORTATION; ARKANSAS DEPARTMENT OF TRANSPORTATION; ASA HUTCHINSON, GOVERNOR OF THE STATE OF ARKANSAS; LARRY W. WALTHER, DIRECTOR OF ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION; ANDREA LEA, AUDITOR OF THE STATE OF ARKANSAS; AND DENNIS MILLIGAN, TREASURER OF THE STATE OF ARKANSAS | **Opinion Delivered:** December 1, 2022 <br><br> APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-18-7758] <br><br> HONORABLE MORGAN E. WELCH, JUDGE |
| APPELLANTS | |
| V. | |
| SHELLY BUONAUITO, MARY WEEKS, VERLON ABRAMS, AND SARAH B. THOMPSON | <u>REVERSED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.</u> |
| APPELLEES | |

**JOHN DAN KEMP, Chief Justice**

Appellants Keith Gibson, Tom Schueck, Robert S. Moore, Jr., Alec Farmer, and

Philip Taldo, Members of the Arkansas State Highway Commission; Scott E. Bennett,

Director, Arkansas Department of Transportation ("the Department") (collectively

"Highway Appellants"); Dennis Milligan, Treasurer of the State of Arkansas; Andrea Lea,

Auditor of the State of Arkansas; Larry W. Walther, Director, Arkansas Department of Finance & Administration ("DF&A"); and Asa Hutchinson, Governor of the State of Arkansas (collectively "State Appellants") ("Highway Appellants" and "State Appellants" collectively as "appellants"), appeal a Pulaski County Circuit Court order awarding $18,160,000 in attorneys' fees to the Conway law firm of Denton & Zachary, PLLC ("Denton & Zachary"), counsel for appellees Shelly Buonauito, Mary Weeks, Verlon Abrams, and Sarah B. Thompson (collectively "appellees"). For reversal, State Appellants argue that the circuit court erred in awarding attorneys' fees and in its application of the *Chrisco* factors, as set forth in *Chrisco v. Sun Industries*, 304 Ark. 227, 800 S.W.2d 717 (1990). They also assert that they should not have to pay attorneys' fees. Highway Appellants argue that sovereign immunity bars the fee award and that the circuit court abused its discretion in (1) awarding attorneys' fees, (2) calculating the award using a percentage-contingency-fee method, and (3) applying the *Chrisco* factors. On cross-appeal, appellees contend that the circuit court erred in denying their motion for contempt against appellants. We reverse the circuit court's award of attorneys' fees and costs, and on cross-appeal, we affirm the circuit court's denial of appellees' motion for contempt.

## I. *Facts*

We recited the underlying facts of this case at length in the previous appeal, *Buonauito v. Gibson*, 2020 Ark. 352, 609 S.W.3d 381. In *Buonauito*, we held that tax funds levied from Amendment 91 to the Arkansas Constitution could only be used for constructing or improving four-lane highways and that the use of Amendment 91 funds for two projects, CA0602 and CA0608 involving six-lane interstate highways, constituted an illegal exaction.

2

*Id.* at 8, 609 S.W.3d at 386. We reversed and remanded for the circuit court to enter an order consistent with our opinion. *Id.*, 609 S.W.3d at 386. On remand, the circuit court entered an amended order declaring an illegal exaction and enjoining the use of Amendment 91 funds on the CA0602 and CA0608 projects.

The Department reviewed the Amendment 91 expenditures and determined that $83,745,901.56 of unreimbursed funds had been spent on project CA0602 and $37,363,490.28 of unreimbursed funds on project CA0608 for a total of $121,109,391.84 to be reimbursed to the Department's Amendment 91 fund.[1] On January 28, 2021, the parties entered into a joint stipulation that "the net balance to be reimbursed to the Amendment 91 fund [was] $121,109,391.84." On February 1, 2021, the circuit court ordered that $121,109,391.84 "shall be reimbursed to the Amendment 91 fund." As part of the judgment, the circuit court reserved jurisdiction to consider the attorney's-fee issue.

Appellees had entered into a 25 percent contingency-fee agreement with Denton & Zachary in 2018. On February 16, 2021, appellees filed a motion for attorneys' fees, costs, and expenses. In their brief, they relied on *Walther v. Wilson*, 2020 Ark. 194, 600 S.W.3d 554, as precedent to support a "reasonable contingency fee," and they requested $18,715.57 in costs and expenses. Attached to their motion was (1) an affidavit of Justin C. Zachary, lead counsel, who stated that his firm had spent 771.70 hours on the case; (2) Denton & Zachary's itemized bill totaling 771.70 hours; (3) Denton & Zachary's representation letters to separate appellees; (4) an itemized list of expenses totaling $18,715.57; (5) an affidavit of

---

[1]Per the parties' stipulation, "a portion of these funds have been reimbursed to the Amendment 91 fund through normal federal and state reimbursements, not as a result of this lawsuit and the subsequent orders."

Dr. Ralph D. Scott, Jr., Ph.D., a professor of economics at Hendrix College; (6) a declaration of Thomas P. Thrash, an attorney with extensive litigation experience; and (7) an affidavit of Paul Byrd, a Little Rock attorney, who advocated for a fee award for appellees' attorneys.

On March 30, 2021, appellants jointly responded to the motion for attorneys' fees. They argued that appellees were not entitled to attorneys' fees because (1) sovereign immunity prohibited an award of attorneys' fees; (2) there was no statutory authority to award attorneys' fees; (3) *Walther*, 2020 Ark. 194, 600 S.W.3d 554, was inapplicable because the funds had not been transferred to a private entity; and (4) there was no substantial benefit to the state or common fund. They asserted that even if appellees were entitled to attorneys' fees, the requested amount of fees and costs was excessive, unreasonable, and should be significantly reduced. Attached to their joint response were (1) appellees' responses to appellants' requests for admission; (2) an affidavit of Jared D. Wiley, assistant chief engineer for planning at the Department; and (3) motions for attorneys' fees filed by appellees' counsel in other cases.

On April 6, 2021, appellees filed a motion for enforcement of the court's order, for civil contempt, and for funds to be deposited in the registry of the court for review by a special master. In their motion, they requested that appellants be found in contempt and that the circuit court enter an order directing $121,109,391.84 to be deposited into the registry of the court. Appellants responded and moved for dismissal because they had repaid the Amendment 91 fund and had sent proof of a full reimbursement on April 2, 2021.

4

The circuit court held a two-day hearing on the motions. The Department's director, Lorie Tudor, testified about its highway funding and its procedure for reimbursing $121,109,391.84 to the Amendment 91 fund pursuant to this court's order. Tudor explained that she and Wiley developed a funding plan "after the Supreme Court opinion" in which eight construction projects were ear-marked for Amendment 91 fund eligibility. She described the Department's reimbursement procedure as "an accounting exercise," stating, "[T]here's an account that's called Amendment 91 and there's an account for regular state funds, and we changed the coding on those projects to be in compliance." She further explained, "The 121 million, the journal entry transferred 121 million of Amendment 91 funds to those [eight] projects below, and the regular state funds from each of those projects below was journal entried into those – the 30 Crossing [CA0602] and 630 [CA0608] project. It was a redistribution of funds." Specifically, Tudor provided the following analogy:

Well, everyone in the courtroom understands about those big tins of popcorn you get at Christmas, and you have your cheesy popcorn, your caramel popcorn, and your regular popcorn. . . . Well, highway funding is very, very similar. . . . [Y]ou have Amendment 91 funds, you have regular state funds, and you have federal funds, three major types of funds, but it's all money. It's all funding. It's a finite, fixed amount of money. The amount of popcorn doesn't change, the amount of money doesn't change, just the flavor.

So when the Supreme Court ruling came down and we knew that we were going to have to rearrange our funding. . . . I told our commissioner, ["L]ook, don't worry. The amount of funding has not changed. The projects will not change. We have a lot of flexibility with our funding. We just need to move the funding around to be in compliance with the Supreme Court ruling.["]

So basically, what we did is, if you want to think of the caramel popcorn as Amendment 91 funds, we took all the caramel popcorn away from 30 Crossing [CA0602] and 630 [CA0608], and we put it into other project bowls. And we took regular state funds from them and put it into 30 Crossing [CA0602] and 630 [CA0608]. It's that simple. There's the same amount of money. The amount of money didn't change. The projects that we funded didn't change. We just had to do

5

an accounting exercise in order to be in compliance. . . . [O]verall, I was just reassuring our commissioners that the amount of funding wasn't going to change, it was just how we distributed the funding.

She later reiterated,

We knew that $121 million had been expended of Amendment 91 funds on 30 Crossing [CA0602] and 630 [CA0608]. . . . [T]hey could no longer use Amendment 91 funds on those projects, so we went through the exercise of identifying projects that were eligible for Amendment 91 funds and doing – putting together the journal entry for the expended funds so that we journal entried over on one side regular state funds from these eligible projects. We journal entried the regular state funds to 30 Crossing [CA0602] and 630 [CA0608] thus reimbursing Amendment 91 funds. And we took the Amendment 91 funds that had been expended on 630 [CA0608] and 30 [CA0602] and applied them to these projects, which was an eligible use of Amendment 91 funds.

During Tudor's testimony, plaintiff's exhibit 4 was received into evidence without objection. Exhibit 4, entitled "Reimbursement of Amendment 91 Funds," outlined the Department's itemization of the court-mandated $121,109,391.84 reimbursement, which included eight construction projects and the total amount expended on each project, as follows: (1) Highway 5 for $28,601,975.26; (2) Highway 147 for $5,734,068.11; (3) Highway 206 for $7,205,605.07; (4) I-49 for $5,366,874.59; (5) Highway 274 at Hampton for $17,427,754.03; (6) Highway 274 North for $10,483,372.13; (7) Highway 331 for $45,244,394.00; and (8) Highway 64 for $1,045,348.65, totaling $121,109,391.84 in reimbursement to the Amendment 91 fund as stipulated by the parties. In her testimony, Tudor emphasized exhibit 4's footnote, which states, "The amount of [regular] state funds expended on the 8 projects listed will now be funded with Amendment 91 funds. These [regular] state funds will be used to reimburse Amendment 91 funds expended on CA0602 and CA0608."

Plaintiff's exhibit 3 was also received into evidence without objection. Tudor described exhibit 3 as the Department's plan to reconcile the funding of its projects in an effort to comply with *Buonauito*, 2020 Ark. 352, 609 S.W.3d 381. Under a section entitled "Projects Completed," the foregoing eight projects were listed with a note that $121,109,000 in "Amendment 91 Funds [was] Moved from [CA0602] and [CA0608] and Applied to Eligible Projects, while $83,746,000 and $37,363,000 in "Regular State Funds [was] Applied to [CA0602] and [CA0608.]"

Exhibit 3 also revealed the Department's plan to reconcile the funding of other four-lane projects subjected to *Buonauito*, 2020 Ark. 352, 609 S.W.3d 381. From the Department's three types of projects—projects completed, projects scheduled, and projects under construction—the "Grand Total" indicated that "489,836 [million]" of "Federal and Regular State Funds [was] Applied to 30 Crossing and I-630" while "489,836 [million]" of "Amendment 91 Funds [was] Moved from 30 Crossing and I-630 and Applied to Eligible Projects." During cross-examination, when specifically asked about the CA0602 project and any Amendment 91 funds released to other eligible projects, Tudor stated, "[W]e were going to spend that money anyway on those highways. There's not additional money. The projects . . . didn't change."

Lisa Wilkerson, an assistant administrator in the accounting office at DF&A, testified that she operated, maintained, and helped the state agencies make entries into the State's accounting system, known as the Arkansas Administrative Statewide Information System. She stated that the Department had contacted DF&A about reconciling the accounts of the Amendment 91 fund. During her testimony, exhibits were introduced that showed funds

7

being transferred from the Department's general fund into the Amendment 91 fund in the amount of $121,109,391.84. Wilkerson testified that these "reconciliations" would show up on a DF&A ledger as "transfers."

Dr. Scott also testified at the hearing. He admitted that he is not a highway-funding expert and had never prepared a financing plan for a transportation entity. He also stated that he had never testified in an illegal-exaction case against the Department. He testified that, in his estimation, the total benefit to the Amendment 91 bond account was approximately $448 million, or $448,191,448. He reached that conclusion by "a total reimbursement amount of 159 million, and that's the 121 million that still needs to be reimbursed plus the 38 million that has actually already been reimbursed." He testified that after the "121 million that still needs to be reimbursed . . . that leaves us 288,957,000 . . . available for construction." When asked how the total budget for the Department had not changed but how the Amendment 91 account had benefited, Dr. Scott stated that "[it] was a very restrictive account" and "[t]hose funds had to be used for a specific purpose." On cross-examination, however, when asked if he agreed that "paying for something from my savings account versus paying for something from my checking account doesn't create an economic benefit for my son," Dr. Scott replied, "Yeah. I would agree with that."

Local attorneys Tom Thrash and Paul Byrd also testified at the hearing. Thrash testified that he has been practicing since 1980 and that since 1996, his practice has focused on class actions and "cases similar to this." Thrash testified that a 25 percent contingency fee was "in line with the standard fees in this locality and across the country." Additionally, Paul Byrd, an attorney from Little Rock who has been licensed since 1985, testified that he

8

had worked with Zachary in other cases. Byrd stated that he believed an illegal exaction would "take three years to get to conclusion." Byrd testified that the risk taken by working on such a case would justify a contingency fee.

On June 30, 2021, the circuit court entered an order awarding $18,160,000 in attorneys' fees to Denton & Zachary. The circuit court found that because appellees had "established a substantial benefit to the State of Arkansas as well as the creation and/or preservation of a common fund, this court GRANTS Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses." The circuit court ruled that Denton & Zachary's attorneys' fee constituted "approximately a 15% contingency fee of the $121,109,391.84 reimbursed to the Amendment 91 Fund." In addition to the $18,160,000 in attorneys' fees, the circuit court awarded $6,896.70 in costs. Appellants filed motions for reconsideration, which were deemed denied by operation of law. Appellants now bring their appeal.

## II. *Attorneys' Fees*

For the first point on appeal, State Appellants argue that the circuit court erred in awarding attorneys' fees. Specifically, they contend that (1) sovereign immunity bars the award of attorneys' fees; (2) no statutory authority exists for awarding the fees; and (3) appellees are not entitled to attorneys' fees because the American rule exceptions do not apply.

Highway Appellants assert that the circuit court (1) erred because sovereign immunity bars the award of attorneys' fees and costs; (2) abused its discretion in awarding attorneys' fees and costs because no exception to the American rule applies; and (3) abused its discretion by calculating the fees award using a percentage–contingency-fee method.

9

Appellees respond that (1) the circuit court properly ruled that sovereign immunity was not a bar to attorneys' fees; (2) the circuit court did not abuse its discretion in finding that the underlying illegal-exaction claim entitled them to attorneys' fees and costs; and (3) the circuit court did not abuse its discretion by awarding a percentage-contingency fee.

Thus, based on the arguments before this court, the sole question before us is whether the circuit court abused its discretion in awarding a flat 15 percent attorneys' fee award of $18,160,000 to Denton and Zachary from the court-mandated amount of $121,109,391.84 reimbursement. We first turn to appellants' claim for attorneys' fees under our statutes, the American Rule, and its exceptions.

### A. Statutory Authority for Attorneys' Fees and Exceptions

Both State Appellants and Highway Appellants argue that there is no statutory authority to award attorneys' fees. They contend that Arkansas has adopted the American rule for attorneys' fees, which stands for the proposition that attorneys' fees are not recoverable in litigation unless expressly provided for by statute. They further contend that the exceptions to the American rule do not apply in this instance.

Appellees respond that the circuit court did not abuse its discretion in finding that the underlying illegal-exaction claim entitled them to attorneys' fees and costs. Specifically, they assert that the Amendment 91 litigation increased funds in the Amendment 91 account; the circuit court's judgment protected and preserved funds in the Amendment 91 account; and the Amendment 91 litigation provided a substantial benefit to the taxpayers of Arkansas.

10

### 1. *Statutory authority*

Arkansas follows the American rule, which requires every litigant to bear his or her attorneys' fees, absent a state statute to the contrary. *Walther v. Wilson*, 2019 Ark. 105, at 5, 571 S.W.3d 897, 900; *Lake View Sch. Dist. No. 25 v. Huckabee*, 340 Ark. 481, 495, 10 S.W.3d 892, 900 (2000); *Millsap v. Lane*, 288 Ark. 439, 442, 706 S.W.2d 378, 379 (1986). The decision to award attorneys' fees and the amount to award is discretionary and will be reversed only if the appellant can demonstrate that the circuit court abused its discretion. *Harrill & Sutter, PLLC v. Kosin*, 2011 Ark. 51, at 17, 378 S.W.3d 135, 145.

Arkansas Code Annotated section 26–35–902(a) (Repl. 2012) authorizes an award of attorneys' fees to prevailing litigants in some illegal-exaction cases. *Barnhart v. City of Fayetteville*, 335 Ark. 57, 59, 977 S.W.2d 225, 226 (1998). Section 26–35–902(a) provides,

> (a) It is the public policy of this state that circuit courts may, in meritorious litigation brought under Arkansas Constitution, Article 16, § 13, in which the circuit court orders *any county, city, or town* to refund or return to taxpayers moneys *illegally exacted by the county, city, or town*, apportion a reasonable part of the recovery of the class members to attorneys of record and order the return or refund of the balance to the members of the class represented.

*Id*. (emphasis added).

In reviewing section 26–35–902(a), we construe the statute so that no word is left void, superfluous, or insignificant, and we give meaning and effect to every word in the statute, if possible. *Ark. Game & Fish Comm'n v. Gerard*, 2018 Ark. 97, at 4, 541 S.W.3d 422, 425. When interpreting statutes, our review is de novo, as it is for this court to decide what a constitutional and statutory provision mean. *Id*., 541 S.W.3d at 425.

In the present case, the circuit court ruled from the bench that "this is not something that is authorized expressly by statute." We agree. The plain language of section 26–35–

11

902(a) clearly states that attorneys' fees in illegal-exaction actions may only be imposed against "any county, city or town" and only when a refund is ordered to the taxpayers. *See also Hamilton v. Villines*, 323 Ark. 492, 494, 915 S.W.2d 271, 272 (1996).

Specifically, section 26-35-902(a) is inapplicable for the following reasons. First, the present action was brought against the State, and section 26-35-902 does not permit attorneys' fees on illegal-exaction claims against the State. Notably, the General Assembly has not yet seen fit to enact a statute allowing for attorneys' fees in illegal-exaction suits against the State. This court will not read into a statute a provision not put there by the General Assembly. *Our Community, Our Dollars v. Bullock*, 2014 Ark. 457, at 18, 452 S.W.3d 552, 563.

Second, appellees did not request a refund or return to the taxpayers. Instead, the reimbursement transpired within the Department and was transferred from the Department's general fund to its Amendment 91 fund. Based on our well-established standard of review, the circuit court did not abuse its discretion in denying the motion for attorneys' fees on this basis.

### 2. *American rule exceptions*

Next, we must determine whether an American rule exception applies. When attorneys' fees are not expressly authorized by section 26-35-902(a), this court has held that they may be permissible under the two exceptions to the American rule. Those exceptions are (1) the "common fund" doctrine and (2) the "substantial benefit" rule. *Millsap*, 288 Ark. at 442, 706 S.W.2d at 379–80.

### a. Common-fund exception

First, under the common-fund exception, a plaintiff has created or augmented a common fund or assets have been salvaged for the benefit of others as well as himself or herself. *Walther v. Wilson*, 2019 Ark. 105, at 5, 571 S.W.3d 897, 900 (*Wilson II*). In such a situation, to allow the others to obtain the full benefit from the plaintiff's efforts without requiring contribution or charging the common fund for attorneys' fees would be to enrich the others unjustly at the expense of the plaintiff. *Id.*, 571 S.W.3d at 900.

The present case is not an illegal-exaction case where a class action is sought, and a common fund is established. *See Fox v. AAA U-Rent It*, 341 Ark. 483, 489–90, 17 S.W.3d 481, 485–86. A common fund contemplates a new pool of money. *Id.*, 17 S.W.3d at 485–86. Here, contrary to the circuit court's findings, no common fund was created, and no new pool of money was created. Thus, the record does not support a common-fund exception.

### b. Substantial-benefit exception

#### i. *Applicable law*

The second exception is the substantial-benefit rule. This court first acknowledged the rule in a shareholder-derivative action. *Millsap*, 288 Ark. at 442, 706 S.W.2d 379–80 (citing *Fletcher v. A.J. Indus.*, 266 Cal. App. 2d 313 (1968)). We stated that a shareholder could recover attorneys' fees against a corporation "if the corporation received 'substantial benefits' from the litigation even [when] the benefits were not pecuniary and no fund was created." *Id.* at 442, 706 S.W.2d at 380.

We then extended the exception to cover attorneys' fees against the State of Arkansas in *Lake View*, 340 Ark. at 495, 10 S.W.3d at 900–01. But the *Lake View* court explicitly

13

limited the extension to the facts presented in that case. There, we recognized a substantial-benefit exception, stating, "[T]here [was] no question but that a substantial *economic* benefit [had] accrued not only to the poorer school districts as a direct result of Lake View's efforts but to the state as a whole" and that it was "beyond dispute" that "the State derived a substantial benefit from the efforts of Lake View's counsel[.]" *Id.* at 495–96, 10 S.W.3d at 900–01 (emphasis added). On the issue of a substantial benefit, we opined, "With the gradual elimination of disparities in funding and opportunities for students and with the passage of Amendment 74, education in the State unquestionably has benefitted." *Id.* at 495, 10 S.W.3d at 900–01. We further emphasized that "this is a unique case with a unique set of circumstances" and that we did not sanction attorneys' fees "in all public-interest litigation or endorse a new exception to the American Rule." *Id.* at 497, 10 S.W.3d at 902. We reversed and remanded for a determination of reasonable fees. *Id.*, 10 S.W.3d at 902.

Despite the "unique set of circumstances" of the fee award in *Lake View*, *id.*, 10 S.W.3d at 902, we subsequently awarded attorneys' fees under the substantial-benefit exception in *Wilson II*, 2019 Ark. 105, 571 S.W.3d 897. But that case involved a direct financial benefit to the State because state funds were returned from a private entity. In *Wilson v. Walther*, 2017 Ark. 270, 527 S.W.3d 709 (*Wilson I*), appellant Mike Wilson, a taxpayer, brought an illegal-exaction lawsuit that successfully challenged the constitutionality of certain legislative acts of 2015 appropriating funds from the Arkansas General Improvement Fund to eight regional planning and development districts. The court held that the acts were unconstitutional and reversed and remanded. *Wilson I*, 2017 Ark. 270, at 11, 527 S.W.3d at 716. Upon remand, the circuit court ruled that Wilson had

14

conferred a benefit to taxpayers in the amount of the GIF funds appropriated but unspent and that Wilson was entitled to an award of attorneys' fees of one-third of the remaining $969,799.60 GIF funds, or $323,266.53. *Wilson II*, 2019 Ark. 105, at 2, 571 S.W.3d at 898. The circuit court ordered the balance of the remaining GIF funds to be paid to the State Treasurer. *Id.* at 3, 571 S.W.3d at 899. In *Wilson II*, this court held that a substantial benefit had been conferred to the benefit of the taxpayers. *Id.* at 7, 571 S.W.3d at 901.

ii. *Analysis*

The present case is distinguishable from this line of precedent in Arkansas. In *Lake View*, this court noted that the litigation presented remarkable circumstances. The substantial-benefit rule announced in *Lake View* was *sui generis* and not to be repeated. This court clearly stated that, by authorizing attorneys' fees, it was not "endorsing a new exception to the American Rule." *Lake View*, 340 Ark. at 497, 10 S.W.3d at 902.

This court then ignored the admonition from the *Lake View* court and authorized fees in *Wilson II*, 2019 Ark. 105, 571 S.W.3d 897. But unlike the GIF funds in *Wilson II*, the Amendment 91 funds in this case have not been transferred to a private entity and have not been abandoned. In fact, the *Wilson* funds were ordered to be returned to the State of Arkansas. *Id.* at 3, 571 S.W.3d at 899. As in *Lake View*, our decision in *Wilson II* finding a substantial benefit had been conferred to taxpayers was predicated on the case's unique circumstances—GIF funds were remitted from a private entity back to the State treasury. Yet, the dissent would extend our holding in *Wilson II* to find a substantial benefit in this illegal-exaction case where no State funds were recouped. Under the dissent's rationale, a substantial benefit would accrue whenever there is an illegal exaction, thereby permitting

15

attorneys' fees in every instance. In the absence of statutory authority, the exception would swallow the rule.[2]

In the present case, the Amendment 91 funds remain in the Department's control, no new funds have been created, and the State Treasury has not received any direct financial compensation. As a result, we decline to extend the substantial-benefit exception any further to cover a nonpecuniary interest in the proper reallocation of departmental funds. The decision to allow attorneys' fees in scenarios like this one rests with the General Assembly, the branch of government tasked with implementing public policy. *See Martin v. Haas*, 2018 Ark. 283, at 9, 556 S.W.3d 509, 515. Thus, we continue to follow the American rule and leave to the legislative branch policy decisions on whether to allow attorneys' fees.

This conclusion is further supported by the testimony at the hearing. Director Tudor explained the Department's reallocation process. She testified that the $121 million of Amendment 91 funds had been transferred to other departmental construction projects, and "the regular state funds from each of those projects . . . was journal entried into the [CA0602 and CA0608] project[s]." When asked if new funds had been created or if the Department

---

[2]This court also held in *Wilson II*, 2019 Ark. 105, at 4–5, 571 S.W.3d at 899–900, that sovereign immunity did not apply. Every dissenting justice in this case joined *Wilson II* in which this court stated that because the State relinquished the funds, "sovereign immunity is not an issue[.]" *Id.* at 4, 571 S.W.3d at 900. Even appellants agree that the State never relinquished the funds in the case at bar. Therefore, while we do not need to address the defense of sovereign immunity in order to deny a claim of fees, the dissent must do so to overcome its holding in *Wilson II*.

Further, although we did hold that the State could be sued for illegal exactions in *Rutledge v. Remmel*, 2022 Ark. 86, 643 S.W.3d 5, the attorneys'-fee issue was not before the court in that case; accordingly, it provides no basis for authorizing attorneys' fees in this case.

16

had received any money, she replied no. Additionally, according to Wilkerson's testimony, DF&A reconciled the Department's accounts by simultaneously taking $121 million out of the Amendment 91 fund and then reimbursing the Amendment 91 fund with $121 million from other departmental funds. The record reveals that these funds are unlike those in *Wilson II* because they have never left the State's possession.

In light of this analysis, the dissent, citing only one case with scant legal analysis, fails to provide to the bench, bar, and people of Arkansas a rationale by which it would affirm the circuit court's award of approximately $18 million in state funds to the attorneys at Denton and Zachary. It further fails to address how its proposed ruling would comport with the majority's sovereign-immunity analysis in *Wilson II*.

In sum, we hold that, in the absence of express statutory authority, the circuit court abused its discretion in awarding $18.16 million in attorneys' fees and costs to Denton & Zachary. While we commend the attorneys at Denton & Zachary for bringing an illegal-exaction suit to correct the Department's allocation of funds, we nevertheless hold that no basis exists for the award of $18.16 million in attorneys' fees and costs. Accordingly, we reverse on this point.

Because we hold that the circuit court abused its discretion in awarding attorneys' fees and costs, we decline to reach appellants' remaining arguments on appeal concerning a contingency fee, the *Chrisco* factors, any apportionment of fees, and sovereign immunity.

### III. *Cross-Appeal*

On cross-appeal, appellees argue that the circuit court erred in denying their motion for contempt against appellants. Appellees had filed a motion for civil contempt against

17

appellants, arguing that they have failed to reimburse the Amendment 91 fund pursuant to this court's holding in *Buonauito*, 2020 Ark. 352, 609 S.W.3d 381, that the use of Amendment 91 funds for the CA0602 and CA0608 projects constituted an illegal exaction.

Civil contempt can only be established when there is a willful disobedience of a valid court order. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 450, 156 S.W.3d 228, 235 (2004). We review civil-contempt proceedings for whether the findings are clearly against the preponderance of the evidence. *Ark. Dep't of Health & Hum. Servs. v. Briley*, 366 Ark. 496, 501, 237 S.W.3d 7, 11 (2006). In our review, we defer to the superior position of the circuit court to determine the credibility of witnesses and the weight to be given their testimony. *Russell v. Russell*, 2013 Ark. 372, at 9, 430 S.W.3d 15, 20.

Here, the circuit court entered its order on February 1, 2021, finding that $121,109,391.84 "shall be reimbursed to the Amendment 91 Fund." As previously noted, Tudor testified that the Amendment 91 fund had been reimbursed, and Wilkerson testified that she was involved in making those accounting adjustments. Thus, we hold that the circuit court properly denied appellees' contempt motion, and we affirm the circuit court's ruling.

Reversed on direct appeal; affirmed on cross-appeal.

WOMACK, J., concurs.

BAKER, HUDSON, AND WYNNE, JJ., dissent.

**SHAWN A. WOMACK, Justice, concurring.** By recovering $121 million and triggering the preservation of at least an additional $289 million of funds collected via the Amendment 91 tax, the appellees undoubtedly created a substantial economic benefit for

18

the citizens of the State. Because of their efforts, all taxes collected under Amendment 91 are now restricted for use on the construction or improvement of four-lane highways across Arkansas, as approved by voters. This is guaranteed funding, which can now only be depleted if spent on eligible projects. However, the attorneys are not entitled to fees because fees are not authorized in this matter by any provision in a statute or in our state's constitution.[1]

Illegal-exaction lawsuits are the cornerstone of accountability between the government and the taxpaying citizens that it serves. Our framers recognized the importance of balancing the relationship between taxpayers and tax spenders and enshrined the right to file illegal-exaction lawsuits in our constitution. Ark. Const. art. 16, § 13. By doing so, they carved out an exception to the general prohibition of lawsuits against the state under the sovereign immunity clause. *See* Ark. Const. art. 5, § 20. By representing taxpayers and ensuring that governmental entities act appropriately when spending taxpayer funds, the attorneys in these cases do a great service to our state and it seems only right that they be compensated for that service. However, nothing in our state law currently

---

[1]The plurality opinion fails to address the appellants' argument that sovereign immunity bars the recovery of attorney fees in successful illegal-exaction claims against the State. Because sovereign immunity implicates this court's subject-matter jurisdiction, we have a duty to address it. *Thurston v. League of Women Voters of Ark.*, 2022 Ark. 32, at 17, 639 S.W.3d 619, 627 (Womack, J., dissenting); *see also Harris v. Hutchinson*, 2020 Ark. 3, at 9–10, 591 S.W.3d 778, 783–84 (Wynne, J., concurring). Sovereign immunity is nevertheless inapplicable because the constitution expressly authorizes illegal-exaction lawsuits against the State. Ark. Const. art. 16, § 13; *see also Rutledge v. Remmel*, 2022 Ark. 86, at 10, 643 S.W.3d 5, 11 (Womack, J., concurring). Consequently, sovereign immunity does not bar the attendant financial consequences of illegal-exaction lawsuits, such as attorney fees, if the General Assembly were to be inclined to permit fees in such actions. *See* Ark. Const. art. 16, § 13.

authorizes attorney fees to be paid in an action such as the one before us.  Therefore, I call

upon the members of the General Assembly to visit this situation to determine if they, in

their policy-making role, believe attorneys in future actions of this nature should be

authorized to receive compensation.  It is the legislature that possesses the power to do so,

not the courts.

> The legislature has already determined that

> It is the public policy of this state that circuit courts may, in meritorious litigation brought under Arkansas Constitution, Article 16, §13, in which the circuit court orders any county, city, or town to refund or return to taxpayers moneys illegally exacted by the county, city, or town, apportion a reasonable part of the recovery of the class members to attorneys of record . . . .

Ark. Code Ann. § 26-35-902(a).  The legislature could have included orders against the

state or any of its agencies, but it did not.  While this court has recognized that the legislature

does not have the authority to waive sovereign immunity and authorize suits against the

state generally, *Bd. of Trs. of Univ. of Ark. v. Andrews*, 2018 Ark. 12, at 10, 535 S.W.3d 616,

622, the specific constitutional authorization of illegal-exaction suits gives the General

Assembly the liberty to address the remedies available in such actions, including the

authorization of attorney fees.  Further, while the language of the statute tracks with the

constitution's reference to "county, city, or town," the phrase in article 16, section 13

modifies "[a]ny citizen." Thus, it qualifies who may file suit and does not limit which public

entities can be sued.  Ark. Const. art. 16, § 13. Thus, it qualifies who may file suit; it does

not limit which public entities can be sued.  *Id*.

While I join the plurality's judgment that attorney fees are not authorized in this case,

I respectfully differ as to the analysis.  While the plurality attempts to distinguish the facts of

20

this case from those in the cases that created exceptions to our rule, I would not walk such a tightrope and would, instead, acknowledge the mistakes this court has made in the past and correct them here. As discussed below, this court has recognized "common-fund" and "substantial benefit" exceptions to our rule on attorney fees. These exceptions may well be good public policy; however, as public policy, the power to establish them lies with the legislative branch, not with the judicial branch.

The principle that each party should bear its own attorney fees was first recognized in *Arcambel v. Wiseman*, 3 U.S. 306 (1796). This court adopted that principle, which was later popularized as the "American Rule," in *Thorn v. Clendenin*, when we held that "[o]ur entire law of costs and fees is, in substance, statutory[;] [t]he common law did not professedly allow any, the amercement of the vanquished party being his only punishment." 12 Ark. 60, 62 (1851). We later held that "a court has no jurisdiction over the subject-matter of allowing attorney's fees as costs in any case in the absence of a statute authorizing such fees to be taxed or allowed in those cases." *Peay v. Pulaski Cnty.*, 103 Ark. 601, 610–11, 148 S.W. 491, 495 (1912).

However, in 1905, this court recognized its first exception to the American Rule. *Bradshaw & Helm v. Bank of Little Rock*, 76 Ark. 501, 89 S.W. 316, 317 (1905). In *Bradshaw*, we permitted attorneys who brought an action to recover debt from an insolvent bank to collect attorney fees from a receiver-managed fund. *Id*. We continued to recognize this "common-fund" exception in several instances, noting that "it would be a discouragement if those who might otherwise pursue this type of litigation were inadequately compensated."

21

*Crittenden Cnty. v. Williford*, 283 Ark. 289, 292, 675 S.W.2d 631, 634, *supplemented*, 283 Ark. 289, 679 S.W.2d 795 (1984).

Maintaining adherence to the American Rule—with the recognized common-fund exception—this court reversed the award of attorney fees in an illegal-exaction lawsuit against the State, citing the lack of statutory authority for the award. *Munson v. Abbott*, 269 Ark. 441, 450–51, 602 S.W.2d 649, 655 (1980). However, we crafted a second exception six years later. Piggybacking off the California courts, this court adopted the "substantial benefit" exception, which allowed a successful plaintiff in a derivative action to recover attorney fees against a corporation "if the corporation received 'substantial benefits' from the litigation even where the benefits were not pecuniary[,] and no fund was created." *Millsap v. Lane*, 288 Ark. 439, 442–43, 706 S.W.2d 378, 380 (1986) (quoting *Fletcher v. A.J. Indus.,* 72 Cal. Rptr. 146 (Cal. Ct. App. 1968)).

In *Lake View School District No. 25 v. Huckabee*, this court expanded the scope of the substantial benefit exception to cover economic benefits to the State and put the State on the hook to cover the related attorney fees. 340 Ark. 481, 497, 10 S.W.3d 892, 902 (2000). We continued to invoke this judicially created exception in an illegal-exaction claim against the State. *Walther v. Wilson*, 2019 Ark. 105, at 7, 571 S.W.3d 897, 901; *contra Munson*, 269 Ark. at 450–51, 602 S.W.2d at 655 (holding, before the creation of the substantial benefit exception, that attorney fees are recoverable in an illegal-exaction lawsuit only when authorized by statute).

I do not endorse the departure in *Bradshaw*, *Millsap*, *Lake View*, and *Walther* from the principle that attorney fees are recoverable only when a statute authorizes them. *See Peay*,

22

103 Ark. at 610–11, 148 S.W. at 495; *see also Thorn*, 12 Ark. at 62. The judicially created common-fund and substantial benefit exceptions are a usurpation of legislative power, which we cannot enforce without constitutional or statutory authorization. *See Peay*, 103 Ark. at 611.

Accordingly, unless the constitution or a statute authorizes attorney fees, litigants are not entitled to them. This court should abandon the common-fund and substantial benefit exceptions, instead of simply attempting to narrow them. The General Assembly should consider whether a law to allow recovery of these fees against the State, as exists for claims against counties, cities, and towns is appropriate. Until then, however, we are without the power to award them.

Respectfully, I concur in the judgment only.

**KAREN R. BAKER, Justice, dissenting**. Recovering $448,191,448 worth of funds for taxpayers is meaningless. The amount recovered, $448,191,448 million is inconsequential, pointless, insignificant—*$448 million* is simply inane. That is what the plurality opinion announces to the State of Arkansas today.

The simplicity of this case is this. In *Buonauito I*, we unanimously held that the State had illegally expended Amendment 91 funds on projects, we reversed and remanded the matter to circuit court. *Buonauito v. Gibson*, 2020 Ark. 352, 609 S.W.3d 381. Stated differently, Buonauito won. The State must return the funds. Give the money back, period. Thereafter, upon remand, based on the State illegally using Amendment 91 revenue, $448 million of funds was recovered and unequivocally produced a substantial benefit to the taxpayers. Here, as in *Wilson II*, the litigation preserved millions of dollars in taxpayer

23

money. *See Walther v. Wilson*, 2019 Ark. 105, 571 S.W.3d 897. Specifically, the lawsuit at issue resulted in more than $120 million of illegally-spent funds being reimbursed to the Amendment 91 fund. *One hundred twenty million* in addition to the $288 million that was preserved for the benefit of Amendment 91 and other four-lane highway projects—was reimbursed to the Amendment 91 fund rather than being spent on the I–30 Crossing Project. In other words, use of the Amendment 91 tax dollars for their designated purpose provided a substantial benefit to taxpayers by ensuring the continued construction of four-lane roads. Because of this lawsuit, more areas of the state will receive the benefit of Amendment 91 funds. The fact that the funds reimbursed to Amendment 91 were immediately allocated to other eligible projects demonstrates the benefit conferred by Buonauito's suit.

Undeniably, the record demonstrates that each of Buonauito's experts testified as to the economic benefit to Arkansas taxpayers resulting from the efforts. Dr. Scott testified that the economic benefit to the state and its citizens totaled at least $448,191,448.45 when considering both the amount reimbursed by the State and the additional Amendment 91 funds that would have been spent on the projects in the absence of Buonauito's lawsuit. Further, Thrash, testified about the case's novelty and difficulty, and the enormous benefit to Arkansas taxpayers by counsels' efforts.

Nevertheless, the plurality holds that a substantial benefit was not produced. *Four hundred forty-eight million* was recovered and preserved. Roads throughout the state, not Little Rock, not the I–30 Crossing project, not the I–630 Widening Project, are being constructed. Taxpayers in other areas of the State are benefitting from improvements and repairs to their own roads.

24

Yet, somehow the plurality in swift fashion holds there was not a substantial benefit and therefore, an attorney's fee is not warranted. Maybe the fee award was too much for the plurality to stomach. During oral argument, one justice indicated that should this court affirm, she stated that she would step down tomorrow because her time would be better spent filing suits against our state government, "to get them to re-account their funds on a regular basis, and . . . walk away with millions. That's the message that the Supreme Court, when rewarding those kind of fees -- and if we are going to get into the policy making business, then I am not sure that's good policy either. That's the best use of public tax dollars." Transcript of Oral Argument, at 44 (Sep. 29, 2022) (CV-21-557). However, the *amount* of fees is not a basis for the plurality opinion.

The State of Arkansas spent $448 million illegally. Buonauito's illegal exaction suit established such and resulted in a substantial benefit to the taxpayers. Regardless how the plurality frames the issue—reshuffling or reallocating—a substantial benefit occurred. Despite how the plurality labels the funds—popcorn, peanuts, or the like—a substantial benefit occurred. Simply put, Buonauito prevailed, and the taxpayers unequivocally benefitted substantially from this litigation.  The plurality states,

> [T]he Amendment 91 funds remain in the Department's control, no new funds have been created, and the State Treasury has not received any direct financial compensation. As a result, we decline to extend the substantial-benefit exception any further to cover a nonpecuniary interest in the proper reallocation of departmental funds.

This is absurd. The constitution provides for illegal exaction suits, the plurality and concurring opinion have ensured that as a practical matter there will be no illegal exaction

25

cases in the future. This interpretation is a sleight of hand that effectively invalidates and annuls Article 16, section 13 of the Arkansas Constitution.

Finally, I would be remiss if I did not address the concurring opinion. Our constitution requires justices of this court to faithfully discharge the duties of a supreme court justice and uphold the Arkansas Constitution. *See* Ark. Const. art. 19, § 20. However, the concurring opinion's explanation that "the attorneys are not entitled to fees because fees are not authorized in this matter by any provision in a statute or our state's constitution" is misplaced. The judicially created exception to the statutory requirement to award fees is the law and commands an award of fees. The American rule, as cited by the concurring opinion, likewise is judicially created. Yet, here, the plurality holds not only that taxpayers received no benefit and that $0 is an appropriate fee, but effectively holds that there can be no illegal exactions cases in the future, and that the taxpayers no longer have this constitutional protection.

Accordingly, I dissent from the plurality opinion.

HUDSON and WYNNE, JJ., join in this dissent.

*Leslie Rutledge*, Att'y Gen., by: *Vincent P. France*, Ass't Att'y Gen., for state appellants.

*Friday, Eldredge & Clark, LLP*, by: *Kevin A. Crass* and *Kathy McCarroll*; and *Rita S. Looney* and *Mark Umeda*, Arkansas Department of Transportation, for appellees members of the Arkansas State Highway Commission Keith Gibson, Marie Holder, Robert S. Moore, Jr., Alec Farmer, and Philip Taldo; the Arkansas Department of Transportation; and Lorie Tudor as director of the Arkansas Department of Transportation.

*Denton & Zachary, PLLC*, by: *Justin C. Zachary*, *Joe Denton*, and *Andrew Norwood*, for appellees.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, amicus curiae for Arkansas Trial Lawyers Association.